Ramiro CORNEJO–BARRETO,
aka Rabbit, aka Cornhole,
Petitioner–Appellant,

v.

W.H. SEIFERT, Warden, Respondent–
Appellee.

No. 98–56827.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1999

Withdrawn from Submission
Dec. 10, 1999

Resubmitted July 5, 2000

Filed July 11, 2000

Maria E. Stratton, Federal Public Defender, Craig Wilke (argued), Deputy Federal Public Defender, Santa Ana, California, for the petitioner-appellant.

Alejandro N. Mayorkas, United States Attorney, Monica Bachner, Assistant United States Attorney, Linda M. Aouate (ar-

gued), Assistant United States Attorney, Santa Ana, California, for the respondent-appellee.

Before: FLETCHER, KOZINSKI, and THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

Petitioner appeals the district court's denial of habeas relief from a magistrate's issuance of an extradition certificate and an order of commitment. The magistrate has found that petitioner is likely to be tortured if he is surrendered to the requesting government, but has nonetheless issued the extradition certificate. The United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention"),[1] to which the United States is a party, prohibits extradition if torture is likely. Our task is to determine what procedures are available to petitioner to assert his rights under the Torture Convention and the timing thereof.

We conclude that the Secretary of State first must make a determination as to whether to extradite petitioner in light of his claim that the requesting government is likely to torture him upon surrender. 28 U.S.C. § 2241 confers jurisdiction only when no other relief is available to petitioner.[2] At this point it is still possible that the Secretary will refuse to surrender the petitioner. If the Secretary decides to surrender him, petitioner then will have recourse to federal court.

Examining federal legislation implementing the Torture Convention, we conclude that the Administrative Procedure Act ("APA") allows an individual facing extradition who is making a torture claim to petition, under habeas corpus, for review of the Secretary of State's decision to surrender him. We affirm the district court but direct that the denial be without prejudice.

I.

In August 1991, a judge in Tijuana Mexico issued a warrant for the arrest of Ramiro Cornejo–Barreto, a Mexican citizen who is a lawful permanent resident of the United States, charging him with homicide, robbery, injuries, deliberate property damage, kidnaping, and firing a weapon upon a person. These crimes were alleged to have occurred in Mexico on or about May 5, 1989.

Cornejo–Barreto was arrested in the United States on October 10, 1996 pursuant to a request by the government of Mexico under the U.S.-Mexico extradition treaty. The United States Attorney's office filed a Request for Extradition and Government's Filing of Formal Extradition Papers on December 12, 1996. Cornejo–Barreto appeared before Magistrate Judge Elgin Edwards on July 29, 30, and 31, and on August 6, 1997.

Cornejo–Barreto presented a defense to extradition based on Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, which prohibits countries from surrendering individuals who will face torture in the requesting country. Cornejo–Barreto claimed that he should not be extradited to Mexico because he had been tortured and was likely to again be tortured when he returned. In response to this claim, the magistrate judge conducted a comprehensive factual hearing, allowing Cornejo–Barreto to call a number of witnesses and submit numer-

---

1. United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed April 18, 1988.

2. Were APA review not available, we would be required to reach the merits of the instant petition.

ous exhibits. The government moved *in limine* to exclude the submissions, arguing that they supported an impermissible argument, since the Torture Convention does not create a basis for an extraditee to avoid extradition certification. The magistrate judge ultimately agreed with the government concerning the Torture Convention claim: he determined that the magistrate judge's role in extradition was limited to determining whether probable cause existed concerning the fugitive's alleged crimes. Cornejo–Barreto's evidence of torture was relevant to the magistrate judge's probable cause determination, however, since the allegations threatened to undermine the credibility of portions of the government's evidence.

Cornejo–Barreto introduced evidence that he was arrested and tortured by the State Judicial Police in Tijuana on May 5, 1989. He testified that he had chile shoved up his nostrils, and was deprived of food and water, subjected to death threats, beaten with fists and rifle butts, repeatedly hooded with a plastic bag until he lost consciousness, hung by the wrists, and shocked with electrodes attached to various parts of his body including his genitals. Cornejo–Barreto also testified that he was forced, under threat of death, to sign typewritten documents that he was not allowed to read, as well as blank papers that were later made to appear to be confessions to the charged crimes. Eight days after his arrest, Cornejo–Barreto appeared before a Mexican court for the first time since his arrest. A court document from this initial appearance reflects that Cornejo–Barreto had visible injuries when he was brought to court and that he told a public defender that he had been tortured. To support the credibility of his testimony, Cornejo–Barreto introduced evidence at the extradition hearing demonstrating that the torture he suffered is consistent with reports of torture in Mexico published by the U.S. Department of State and by Amnesty International. A medical expert testified that

Cornejo–Barreto's injuries were consistent with a history of torture, and a psychological expert testified that Cornejo–Barreto's fear of returning to Mexico was consistent with an experience of torture and could reveal the presence of post-traumatic stress disorder.

To isolate any possible taint the alleged torture could have on the evidence supporting the probable cause determination, the judge considered the sufficiency of the evidence without the challenged confessions. He concluded that there was probable cause that Cornejo–Barreto committed the crimes charged in the extradition papers, even if the challenged evidence was excluded. On this basis, the magistrate judge entered Findings[3], an Extradition Certification, and an Order of Commitment on September 26, 1997.

Cornejo–Barreto filed a petition for writ of habeas corpus on October 2, 1997. After a number of amendments to the petition, counsel presented arguments on June 29 and July 27, 1998 before District Court Judge Stotler. Cornejo–Barreto made three arguments: (1) that the extradition order violated Article 3 of the U.S.-ratified Torture Convention; (2) that the order violated his Fifth Amendment right to procedural due process; and (3) that the order violated his Eighth Amendment right to be free from cruel and unusual punishment. On October 7, 1998, the court denied Cornejo–Barreto's petition and granted his request for a stay pending appeal. The court found that the scope of its review was limited to ensuring that the elements necessary for extradition are present, thus barring Cornejo–Barreto's claims. Referring to the Ninth Circuit's rule regarding self-executing treaties explicated in *Saipan v. United States Dep't of Interior*, 502 F.2d 90, 97 (9th Cir.1974), the court found that Article 3 of the Torture Convention was not self-executing. The court found that the petitioner's Fifth

---

**3.** The magistrate judge's finding that petitioner likely would be tortured on his return was irrelevant to his task of determining whether

there was probable cause to believe petitioner committed the crime charged.

Amendment claim was defeated by the special nature of extradition hearings and the limited process due fugitives facing return to a country that requests them. The court dismissed the Eighth Amendment claim on the ground that the Eighth Amendment applies in criminal settings only; under caselaw, extradition proceedings are not criminal proceedings. Finally, the court denied a request by Cornejo–Barreto to admit the evidence included in his extradition proceeding regarding his past torture and fear of future torture. Cornejo–Barreto timely appealed the district court's order denying him habeas relief. On appeal, he raises only the Torture Convention claim.

█ We have jurisdiction under 28 U.S.C. § 1291 and we review de novo. *See Allen v. Crabtree*, 153 F.3d 1030, 1032 (9th Cir.1998) (district court's grant or denial of § 2241 habeas corpus petition reviewed de novo), *cert. denied*, 525 U.S. 1091, 119 S.Ct. 846, 142 L.Ed.2d 700 (1999). We affirm the district court's denial of the petition but direct that it be without prejudice to the filing of a new petition should the Secretary of State decide to surrender Cornejo–Barreto.

## II.

### A. *The Extradition Scheme*

█ Extradition from the United States is governed by 18 U.S.C. § 3184 (2000), which confers jurisdiction on "any justice or judge of the United States" or any authorized magistrate to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation. A statute or

extradition treaty is a prerequisite to extradition. *See Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.1986). The requesting nation must demonstrate that there is probable cause that the fugitive committed the charged offense. *See id.* at 782–83.

█ Extradition is ordinarily initiated by a request from the foreign state to the Department of State. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 478 (1986). The Department of State determines whether the request is within the relevant treaty, and if so, forwards the request to the Department of Justice for a similar screening; once this is complete, the request is forwarded to the United States Attorney for the judicial district where the person sought is located. *See id.* The U.S. Attorney then files a complaint with the appropriate district judge or magistrate, seeking an arrest warrant for the person sought. *See id.* While the foreign state can apply directly to a judge or magistrate, this is rarely done. *See id.* The purpose of the hearing before the magistrate or judge is to determine whether (1) the crime is extraditable[4]; and (2) there is probable cause to sustain the charge. *See Quinn*, 783 F.2d at 787. If these two requirements are met, the judicial officer must certify the individual as extraditable to the Secretary of State. 18 U.S.C. § 3184 (2000). This decision is not subject to direct appeal, but collateral review of the magistrate or judge's order is available through habeas corpus review.[5] *See Collins v. Miller*, 252 U.S. 364, 369–70, 40 S.Ct. 347, 64 L.Ed. 616 (1920).

On habeas, the district court's review has been limited to the following: (1) whether the extradition judge had jurisdic-

---

4. To be extraditable, the crime must be (1) within the scope of the relevant treaty; (2) a crime in both the requesting state and the United States; and (3) not subject to the political offense exception. *See Quinn v. Robinson*, 783 F.2d 776, 786–87 (9th Cir.1986).

5. The "rule of non-inquiry" usually requires extradition courts to refrain from undertaking inquiries into the justice systems of foreign countries. *See, e.g., Mainero v. Gregg*, 164 F.3d 1199, 1205 n. 6 (9th Cir.1999) (noting

that "[t]he 'rule of non-inquiry' recognizes that '[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country' ") (citing *Arnbjornsdottir–Mendler v. United States*, 721 F.2d 679, 683 (9th Cir.1983)). The rule does not bar review of the Secretary's actions, however, since Congress' legislation implementing the Torture Convention, discussed below, clearly supersedes the doctrine, which developed as a matter of federal common law.

tion to conduct the proceeding; (2) whether the extradition court had jurisdiction over the individual sought; (3) whether the extradition treaty was in force; (4) whether the crime fell within the treaty's terms; (5) whether there was probable cause that the individual sought committed the crime, *see Emami v. U.S. District Court*, 834 F.2d 1444 (9th Cir.1987); and (6) whether the crime was within the political offense exception, *see Quinn*, 783 F.2d at 786–787.

Courts in many jurisdictions, including the Ninth Circuit, have discussed the possibility of a humanitarian exception to extradition, tracing the idea to the influential Second Circuit case *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960) (noting in dicta that "[w]e can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination" of the rule that the extradition court may not inquire into those conditions in making its decision). *See, e.g., Lopez–Smith v. Hood*, 121 F.3d 1322, 1326–27 (9th Cir.1997) (discussing in dicta possibility of humanitarian exception); *Emami*, 834 F.2d at 1452–53 (9th Cir.1987) (noting that a humanitarian exception to extradition might someday be articulated by the Ninth Circuit), *Arnbjornsdottir–Mendler v. United States*, 721 F.2d 679, 683 (9th Cir.1983) (same). Our research failed to identify any case in which this theoretical exception has been applied, however, and because we base our decision on legislation implementing the Torture Convention, we need not consider the exception's viability here. *See Mainero v. Gregg*, 164 F.3d 1199, 1210 (9th Cir.1999) (noting that "to date no court has ever denied extradition based on a fugitive's anticipated treatment in the requesting country").

Once a magistrate has certified to the Secretary of State that the individual is extraditable and any habeas review has concluded, the Secretary acts in her discretion to determine whether the person will be surrendered, via extradition warrant, to the custody of the requesting state. 18 U.S.C. § 3186 (2000). The Secretary's decision has been treated as discretionary: until recently, according to the government, there has been "no statute or published regulation applicable to the Secretary's decision-making process in determining whether to sign an extradition warrant or whether to impose conditions on an extradition." Letter Brief of the U.S. Attorney dated February 10, 1998, originally submitted in connection with *In the Matter of the Extradition of Chee Fan Chen*, No. 97–15609, 161 F.3d 11 (9th Cir.1998). The Secretary may place conditions on the extradition of an individual, or may determine that the individual should not be turned over at all. *Id.*

Recent regulations promulgated after Congress passed legislation to implement the Torture Convention, discussed below, appear to be the only regulations governing the Secretary's extradition decisions. Before the implementing regulations were adopted, we held that no judicial review of the Secretary's decision was available. *See Lopez–Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir.1997) (noting that the Secretary's final decision concerning whether to extradite "is a matter exclusively within the discretion of the executive branch and not subject to judicial review.").

## B. *The Torture Convention*

The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment was drafted by the United Nations in an effort to "make effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Preamble, Torture Convention. The Convention defines torture as follows:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for

any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Art. 1(1). The Convention includes provisions aimed at preventing torture, prosecuting torturers, and compensating victims of torture. Most relevant here, Article 3 prohibits ratifying states from returning or extraditing individuals who are likely to face torture. Regarding return or extradition, the Convention provides:

*Article 3*

1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

The Convention was adopted by the United Nations General Assembly on December 10, 1984 and has been ratified by 119 nations, including the United States and Mexico. *See U.N. High Commissioner for Human Rights, Status of Ratifications of the Principal International Human Rights Treaties* (May 15, 2000). The U.S. became a full state party to the Convention in November 1994. *See* U.N. Doc. 571 Leg. SER. E/13.IV.9 (1995).

**6.** Because Congress passed legislation implementing Article 3 of the torture convention in the extradition context, we need not reach the issue of whether that provision of the treaty is self–executing. For this reason, our case is clearly distinguishable from *In re Extradition of Cheung,* 968 F.Supp. 791 (D.Conn.1997), a case decided before the FARR act. There, the district court for the District of Connecticut held that a fugitive facing extradition to Hong Kong could not rely on the torture convention as a defense. *Id.* at 803 n. 17.

FOR a discussion of self–executing and non–self–executing treaties, *see Jordan J.*

## C. Statutory and Regulatory Scheme Implementing Article 3

In 1998, Congress passed legislation implementing Article 3 of the Torture Convention as part of the Foreign Affairs Reform and Restructuring Act ("FARR Act") of 1998. *See* Foreign Affairs Reform and Restructuring Act, Pub.L. No. 105–277, § 2242, 1999 U.S.C.C.A.N. (112 Stat. 2681) 871.[6] This implementing legislation states that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture...." FARR Act, § 2242(a). The FARR Act requires that treaty implementation be carried out by "the appropriate agencies," in this case the Department of State, whose heads are directed to "prescribe regulations to implement the obligations of the United States under Article 3" of the Torture Convention. FARR Act, § 2242(b).

Following the passage of the statute, regulations were adopted by the Department of State to implement its provisions (and thereby, Article 3 of the Torture Convention) in the extradition context. These regulations set out a procedure for the Secretary of State to identify individuals who qualify for relief under the Torture Convention. They state, in relevant part:

§ 95.2 Application

(b) Pursuant to sections 3184 and 3186 of Title 18 of the United States Criminal Code, the Secretary is the U.S. official

*Paust, Self–Executing Treaties,* 82 Am. J. Int'l L. 760 (1988); Charles H. Dearborn III, *The Domestic Legal Effect of Declarations that Treaty Provisions are Not Self–Executing,* 57 Tex. L. Rev. 233 (1979); John Quigley, *The International Covenant on Civil and Political Rights and the Supremacy Clause,* 42 DePaul L. Rev. 1287 (1993); *and* Stefan A. Reisenfeld and Frederick M. Abbott, *The Scope of U.S. Senate Control Over the Conclusion and Operation of Treaties,* 67 Chi.-Kent L. Rev. 571 (1991); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 111 (1986).

responsible for determining whether to surrender a fugitive to a foreign country by means of extradition. In order to implement the obligation assumed by the United States pursuant to Article 3 of the Convention, the Department considers the question of whether a person facing extradition from the U.S. "is more likely than not" to be tortured in the State requesting extradition when appropriate in making this determination.

§ 95.3 Procedures.

(a) Decisions on extradition are presented to the Secretary only after a fugitive has been found extraditable by a United States judicial officer. In each case where allegations relating to torture are made or the issue is otherwise brought to the Department's attention, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant.

(b) Based on the resulting analysis of relevant information, the Secretary may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions.

22 C.F.R. §§ 95.2—95.3 (2000).

D. *Judicial Review of the Secretary's Decisions*

The "Review and Construction" section of the FARR Act makes clear Congress' intention that the agencies—in the extradition context the Department of State—are to have the initial responsibility for implementing Article 3 of the Torture Convention in the United States. Toward this end, the statute directs the Secretary of State to implement the obligations of the United States to enforce the treaty. FARR Act, § 2242(b). The Secretary of State has a statutory duty to carry out the dictates of Article 3, using her discretion to promulgate regulations in the manner she determines to be most effective. In other words, the Secretary may ascertain how best to ensure that the United States

does not extradite an otherwise extraditable individual when "there are substantial grounds for believing the person would be in danger of being subjected to torture. . . ." FARR Act, § 2242(a).

The government argues that we should decline to review the Secretary of State's decisions, noting that a provision of the Department of State's regulations implementing the FARR Act provides that "[d]ecisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review." 22 C.F.R. § 95.4. We disagree. As we demonstrate below, the underlying statute, as well as the background rules of administrative law and habeas jurisdiction, require the opposite conclusion.

### III.

A. *Review Under the Administrative Procedure Act*

 The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (2000), governs decision-making by most federal agencies. *See* 1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 1.1 (3d ed.1994). Its provisions "provide[ ] the statutory structure upon which federal administrative law is built." *Id.* Central to the administrative scheme is the APA's guarantee of judicial review by federal courts of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (2000). The definition of "agency" for APA review purposes comprises "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," except a number of specified authorities, including Congress, the courts, territorial and district governments, military agencies in the time of war, and political party agencies. 5 U.S.C. § 701(b) (2000). Agencies that do not fall within the APA's exceptions are covered by its review provisions.[7]

The final actions of a covered agency are reviewable "except to the extent that—(1)

---

**7.** For a sample of the broad set of agencies whose actions we have determined to be cov-

statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a) (2000). In this case, we must therefore determine (1) whether § 2242(b) of the FARR Act expressly precludes review of the Secretary of State's decision in an Article 3 challenge to extradition, and (2) whether the Secretary's determinations under the FARR Act were made discretionary by Congress.

 The FARR Act does not preclude judicial review of the Secretary's implementation of the Torture Convention, although it may limit judicial review of the regulations she promulgates. *See* FARR Act § 2242(d) ("[n]otwithstanding any other provision of law, and except as provided in the regulations [promulgated by the Secretary], no court shall have jurisdiction to review the regulations adopted to implement this section ...") This statement appears to preclude a facial challenge to the extradition procedures set out in the Department of State's regulations. We need not address the provision's validity, however, because this case does not concern a challenge to the regulations. It is instead a challenge to the way the statute is being *implemented* in this case. *See* DAVIS & PIERCE, *supra*, Vol. 2 at §§ 15.1, 15.14 (noting that challenges to agency rules and regulations are distinct from petitions for review of final agency actions).[8]

 Having determined that review of the Secretary of State's decisions regarding extradition of a fugitive who claims he will be tortured if returned are not precluded by statute, we must determine whether these decisions constitute "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (2000). If so, APA review is not available. 5 U.S.C. § 701(a)(2) (2000). The Supreme Court has explained that § 701(a)(2) precludes review only "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). We recently applied this standard to find that our court had jurisdiction to review the Board of Immigration Appeals' ("BIA") decision not to reopen an alien's case. In *Socop–Gonzalez v. INS*, 208 F.3d 838, 842–846 (9th Cir.2000), we held that even though the agency was given discretion to decide the circumstances in which it would reopen a case, such discretion did not shield the BIA's action from review, since the agency itself had established a standard for reopening.

Under the FARR Act, the agencies are given a mandatory duty to implement Article 3 of the Torture Convention, under which the United States shall not "expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Torture Convention, Article 3. In the extradition context, this means that the Sec-

---

ered by the APA, *see, e.g., Guerrero v. P.W. Stone*, 970 F.2d 626, 628 (9th Cir.1992) (actions of Army Board for Correction of Military Records reviewable under APA), *Oregon Natural Resources Council v. U.S. Forest Service*, 834 F.2d 842, 851–52 (9th Cir.1987) (actions of U.S. Forest Service in context of Clean Water Act standards reviewable under APA), *and Glacier Park Found. v. Watt*, 663 F.2d 882, 885–86 (9th Cir.1981) (actions of National Park Service in awarding concessions contract reviewable under APA).

8. This is not a distinction without a difference. The supreme court, in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), set out a two-step analytical framework for determining whether pre-enforcement review of an agency's regulations was available. This rule is distinct from the standards governing APA review of final agency actions. *See* 2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise §§ 15.1, 15.14 (3d ed.1994). *See also Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation*, 792 F.2d 782, 789 (9th Cir.1986) ("We look to the standards set forth in *Abbott Laboratories* for challenges to administrative actions that have been promulgated but not yet enforced to determine" whether review is available.)

retary of State may not surrender any fugitive who is likely to face torture upon return. The FARR Act imposes a clear and nondiscretionary duty: the agencies responsible for carrying out expulsion, extradition, and other involuntary returns, must ensure that those subject to their actions may not be returned if they are likely to face torture. A reviewing court would have a clear standard against which to measure the Secretary's actions under the *Heckler* rule. *See Heckler,* 470 U.S. at 830, 105 S.Ct. 1649.

▮▮▮▮▮ Although the statute imposes a mandatory duty on the Secretary to implement the FARR Act, the regulations promulgated by the Department of State indicate that the Secretary's duty is discretionary. *See* 22 C.F.R. § 95.4 (2000) ("Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review.") We generally defer to an agency's construction of the statute it administers. *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We are required, however, to reject those interpretations that are contrary to Congressional intent. *See id.* at 843 n. 9, 104 S.Ct. 2778 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.") We therefore reject the argument, advanced by the government, that these regulations preclude judicial review of the Secretary's extradition decisions.

▮▮▮▮ Congress indicated its preference for agency enforcement of the U.S. obli-gations under the Torture Convention in the FARR Act. This scheme is consistent with Article 3 of the Torture Convention, which states that "the competent authorities" are required to ensure that extraditees are not returned if there "are substantial grounds for believing" that the fugitive "would be in danger of being subjected to torture." What *would* be contrary to both the statute and the Convention, is a finding that the Secretary's decisions are wholly discretionary. Article 3 is written in mandatory, not precatory language: "[n]o State Party shall . . . extradite" a person likely to face torture.[9] *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 441, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (discussing the difference between precatory and mandatory treaty language). The FARR Act is similarly forceful: U.S. agencies are directed to "implement the obligations of the United States under Article 3" of the Torture Convention. FARR Act, § 2242(b). As a principle of statutory construction, "we generally construe Congressional legislation to avoid violating international law." *Ma v. Reno,* 208 F.3d 815, 829 (9th Cir. 2000) (citing *Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) and discussing *Murray v. Charming Betsy,* 6 U.S. (2 Cranch) 64, 117–18, 2 L.Ed. 208 (1804)). In this case, the most straightforward construction is perfectly consistent with international law.

▮▮▮▮ Finding that the Secretary's duty to implement the FARR Act is non-discretionary and that the statute does not preclude review, we hold that a fugitive fearing torture may petition for review of the Secretary's decision to surrender him.[10]

---

9. The mandatory nature of Article 3 is even more clear when compared to the language of other provisions in the Torture Convention, which provide more general obligations. Article 14, for example, states:

Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. . . .

10. In holding that the Secretary's decisions are subject to judicial review under the APA, we do not disagree with the Fifth Circuit's statement that "the APA may not apply to extradition hearings." *Wacker v. Bisson,* 348 F.2d 602, 608 (5th Cir.1965). There, the court was examining whether it could review a magistrate's extradition decision under the APA. The Fifth Circuit correctly explained that the courts are not "agencies"; therefore the actions of a magistrate are not reviewable

Courts reviewing such petitions will be required to set aside the Secretary's extradition decisions if they are found to .be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a) (2000).

## B. Form of Review

■ Section 2242(b) of the FARR Act does not provide a new grant of jurisdiction to the federal courts for claims arising under Article 3 of the Torture Convention. The subsection states:

> [N]othing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except·as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

FARR Act, § 2242(b). This provision prohibits courts from reading an implied cause of action into the statute.[11] Of course, we can look to existing jurisdictional statutes to entertain a petition for review under the APA.

■ The APA is not an independent grant of jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). APA claims that do not arise under specially-constructed statutory review provisions must be brought pursuant to other federal statutes granting subject-matter jurisdiction. APA claims are therefore brought in many forms, including declaratory judgment actions, mandamus petitions, and habeas corpus petitions. *See* 5 U.S.C. § 703 (2000). The APA provides that:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.

5 U.S.C. § 703 (2000). Since there is no statutory review provision applicable to FARR claims, and since potential extraditees meet the other requirements for habeas standing under 28 U.S.C. § 2241 (2000), a habeas petition[12] is the most

---

as final agency action. Further, we agree with the Second Circuit's holding that the APA may not be invoked by the United States to obtain review of a magistrate's decision to deny the certification of a fugitive as extraditable. *See United States v. Doherty*, 786 F.2d 491, 502 (2d Cir.1986). In *Doherty*, Judge Friendly reasoned that review was not possible because (1) the magistrate's actions are not "final" within the meaning of the APA, since the government could bring a new extradition request to a different magistrate; and (2) "the variety of officers mentioned in [the extradition statute]—a Supreme Court justice, United States circuit and district judges, a duly authorized United States magistrate, or a judge of a state court of general jurisdiction—cannot individually or as a group reasonably be deemed to constitute an 'agency' " under the APA. *Id. See also LoBue v. Christopher*, 82 F.3d 1081, 1083–84 (D.C.Cir.1996) (APA may not be invoked to review an extradition order).

11. An example of such an implied right of action would be a *Bivens*-like claim against a U.S. official involved in the extradition of an individual who is likely to face torture upon

return to the requesting country. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (finding an implied cause of action for damages based on deprivation of constitutional rights by federal agents).

12. We have noted that a federal prisoner may use the habeas corpus form of action to seek APA review of a parole board's actions. *See Tedder v. United States Board of Parole*, 527 F.2d 593, 594 n. 1 (9th Cir.1975); *see also Brown v. Lundgren*, 528 F.2d 1050, 1053–54. (5th Cir.1976) (allowing a prisoner to challenge a parole board decision using APA standards as a habeas corpus petition). Congress later passed legislation explicitly exempting from judicial review substantive decisions to grant or deny parole. *See Wallace v. Christensen*, 802 F.2d 1539, 1544–45 (9th Cir.1986). However, the procedural holding of *Tedder* relevant here remains good law: habeas corpus is an appropriate form of action under the APA.

appropriate form of action for fugitives seeking review of the Secretary's extradition decisions.[13]

## C. Timing of Review

■■■ The APA provides for review only of final agency action. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.") An APA challenge to the Secretary's extradition decision is therefore ripe for review only after the Secretary has decided to surrender a fugitive who alleges he is likely to face torture. Until that time, there is no final agency action cognizable under APA § 704. Since there has been no final agency action, we do not reach the merits of Cornejo–Barreto's claim.

*CONCLUSION*

The individual's right to be free from torture is an international standard of the highest order. Indeed, it is a *jus cogens* norm[14]: the prohibition against torture may never be abrogated or derogated.[15] We must therefore construe Congressional enactments consistent with this prohibition. In the extradition context, the approach we describe here allows us to give full effect to Congressional legislation without creating a conflict between domestic and international law. We recognize that Congress intended the Secretary of State to act as the "competent authority" charged with enforcing Article 3 of the Convention. We also recognize that Congress did not limit judicial review of the Secretary's decisions under long-standing APA procedures. An extraditee ordered extradited by the Secretary of State who fears torture upon surrender, therefore,

13. The FARR Act of 1998 did not limit habeas corpus review. Courts may not repeal habeas jurisdiction by implication. *See Felker v. Turpin*, 518 U.S. 651, 660–61, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 105, 19 L.Ed. 332 (1868). Any limitation of federal habeas corpus must be "by express command." *See Magana–Pizano v. INS*, 200 F.3d 603, 609 (9th Cir.1999) (habeas jurisdiction under 28 U.S.C. § 2241 not repealed by IIRIRA's transitional rules), *Flores–Miramontes v. INS*, 212 F.3d 1133, 1135–1138 (9th Cir.2000) (same for IIRIRA's permanent provisions). In *Magana–Pizano*, we held that Congress did not repeal habeas jurisdiction under 28 U.S.C. § 2241 when it passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), because the provision eliminating review of certain actions by the Attorney General did not specifically eliminate habeas jurisdiction. Similarly, here there is no mention of habeas corpus review. Indeed, as explained above, the statute does not purport to limit any preexisting jurisdictional or review provisions.

14. The Vienna Convention on the Law of Treaties defines a *jus cogens* norm as "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." United Nations Vienna

Convention on the Law of Treaties, Art. 53, May 3, 1969, 1155 U.N.T.S. 331, 8 I.L.M. 679.

15. The restatement of foreign relations law explains that freedom from torture is a *jus cogens* norm. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702 (1986). Federal courts, including our court, have long recognized the binding nature of the right to be free from torture. *See Filartiga v. Pena–Irala*, 630 F.2d 876, 885 (2d Cir.1980) (right to be free from torture is a "fundamental right"); *Trajano v. Marcos*, 978 F.2d 493, 499 (9th Cir.1992) (death from torture contrary to law of nations), *cert. denied by Marcos–Manotoc v. Traj*, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993), *and on appeal after remand sub nom., In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir.1994) (prohibition of torture is *jus cogens* norm); *and Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir.1995) (official torture prohibited by international human rights and humanitarian norms). *See also* John Dugard & Christine Van Den Wyngaert, *Reconciling Extradition with Human Rights*, 92 Am. J. Int'l L. 187, 198 (1998) ("If any human rights norm enjoys the status of *jus cogens*, it is the prohibition on torture. Consequently, no requested state should have difficulty in justifying a refusal to extradite a person to a state in which he is likely to be subjected to torture-a course approved by the 1984 Convention against Torture ...").

may state a claim cognizable under the APA that the Secretary of State has breached her duty, imposed by the FARR Act, to implement Article 3 of the Torture Convention. Such a claim, brought in a petition for habeas corpus, becomes ripe as soon as the Secretary of State determines that the fugitive is to be surrendered to the requesting government.

■ We may not reach the merits of Cornejo–Barreto's claim at this time. Habeas corpus review is available only when no other relief is available.

We therefore AFFIRM the district court's denial of the petition for habeas corpus but direct that it should be without prejudice to the filing of a new petition should the Secretary of State decide to surrender Cornejo–Barreto.

KOZINSKI, Circuit Judge, concurring:

I do not join Section III of the opinion, because the question of whether petitioner would be entitled to judicial review of an extradition decision by the Secretary of State is not before us. I would hold only that the district court does not have jurisdiction to review petitioner's claim under the Torture Convention, because the FARR Act does not authorize judicial enforcement of the Convention, *see Sandhu v. Burke,* No. 97 Civ. 4608, 2000 WL 191707, at *9 (S.D.N.Y. Feb. 10, 2000), and the Convention is not self-executing under the four-part test of *Saipan v. United States Dep't of Interior,* 502 F.2d 90, 97 (9th Cir.1974). *See Barapind v. Reno,* 72 F.Supp.2d 1132, 1148–49 (E.D.Cal.1999); *see also Sandhu,* 2000 WL 191707, at *10.