Michael WANG, Petitioner,

v.

Robert MASAITIS, United States Marshal, Respondent.

No. CV 03–747–CAS(RC).

United States District Court, C.D. California.

April 27, 2004.

Hoyt Sze, Deputy Fed. Public Defender, Santa Ana, CA, for petitioner.

Mark C. Krause, Assist. U.S. Atty., Los Angeles, CA, for respondent.

### ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SNYDER, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections and respondent's response to petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that: (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on the parties.

### REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Christina A. Snyder, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On March 12, 2003, Magistrate Bina Chainrai of the Magistrate's Court of the Hong Kong Special Administrative Region ("Hong Kong") issued a warrant for the arrest of petitioner Michael Wang for the crimes of: (1) theft, in violation of Section 9 of the Theft Ordinance, Chapter 210, Laws of Hong Kong (charges one through eighteen); and (2) dealing with property known or believed to represent proceeds of an indictable offense, in violation of Section 25(1) and (3) of the Organized and Serious Crimes Ordinance, Laws of Hong Kong (charges nineteen and twenty).[1] Petition, Exh. A. These crimes arose as the result of actions by petitioner as managing director of Pharmedic International (HK) Ltd. ("PMIL").[2] Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho), 353–63 (Affidavit, LING Wai-hong).

On June 9, 2003, the Hong Kong Department of Justice submitted to the United States a formal request for the surrender of petitioner for prosecution on the eighteen counts of theft and two counts of dealing with property known or believed to represent proceeds of an indictable Offence. Krause Decl, ¶ 2, Exh A at 28–40. On June 26, 2003, the United States filed a request to extradite petitioner Michael Wang to Hong Kong. On October 9, 2003, Magistrate Judge Rosalyn M. Chapman held a hearing, and found the extradition treaty between the United States and Hong Kong was constitutional and valid and further found there is probable cause to believe petitioner committed the charged offenses and should be extradited to Hong Kong. On October 17, 2003, this Court certified it had found petitioner extraditable to Hong Kong on all charges. On October 23, 2003, District Judge Christina A. Snyder stayed petitioner's extradition pending resolution of this habeas proceeding.

### II

On October 17, 2003, petitioner filed the pending habeas corpus petition under 28 U.S.C. § 2241, in which petitioner contends: (1) this Court lacked subject matter jurisdiction to certify petitioner's extradition to Hong Kong because the extradition agreement between the United States and Hong Kong is unconstitutional; and (2) probable cause to extradite petitioner on charges three to six and ten to seventeen has not been established. On December 3, 2003, respondent filed an answer, and on January 21, 2004, petitioner filed a reply.

### III

A brief history of Hong Kong, its current political relationship to the People's Republic of China ("P.R.C."), and the development of the extradition treaty between the United States and Hong Kong is helpful for understanding petitioner's first claim. As the Second Circuit summarized:

> Prior to the Opium Wars of the mid–19th century between China and the

1. The details of petitioner's alleged crimes are set forth in the affidavit of Detective Cheung Lap-ho, Senior Inspector of the Hong Kong Police Force. Declaration of Mark C. Krause, ¶ 2, Exh. A at 169–93.

2. PMIL was incorporated in Hong Kong in 1986. Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho). Petitioner was PMIL's managing director and was personally responsible for the day-to-day operations of PMIL. *Id.* at 169–93 (Affidavit, CHEUNG Lap-ho), 353–63 (Affidavit, LING Wai-hong). Prior to March 17, 1997, Pharmedic International, Inc. ("PII"), was the beneficial owner of all shares of PMIL, and petitioner was the sole owner of the shares of PII, which was incorporated in the British Virgin Islands on September 6, 1990. *Id.* at 169–93 (Affidavit, Cheung Lap-ho), 573–81 (Affidavit, YEUNG Bik-yuen (Betty)).

United Kingdom (the "U.K."), Hong Kong was an integral part of imperial China. British rule over Hong Kong was achieved in three stages. In 1842, China ceded rule over Hong Kong Island to the U.K. "in perpetuity" through the Treaty of Nanking, which settled the First Opium War. Under the 1860 Convention of Peking, which ended the Second Opium War, China relinquished the Kowloon Peninsula permanently. Finally, following China's defeat in the Sino–Japanese War of 1894–95, the U.K. secured a lease of the New Territories for 99 years, until June 30, 1997.[¶] As the lease period for the New Territories ran toward expiration, the U.K. and the People's Republic of China ("the PRC") initiated negotiations for the return of sovereignty over Hong Kong to the PRC. These talks culminated in the Joint Declaration on the Question of Hong Kong (the "Joint Declaration"), which the U.K. and the PRC signed on December 19, 1984. In 1990, China promulgated the Basic Law, a framework for the governance of Hong Kong upon reversion to Chinese rule. The Basic Law created the Hong Kong Special Administrative Region (the "HKSAR"); governed by the principle of "one country, two systems." Under this principle, Hong Kong is recognized as an "inalienable part" of the PRC, but its capitalist system is to be "unchanged for 50 years [from July 1, 1997]." [¶] The Basic Law establishes an executive authority, and enumerates its powers and functions, among them, "to conduct relevant external affairs on its own" subject to the ultimate authority of the central government of the PRC. It also creates a new legislature, and preserves the existing judicial system, except for the creation of a new high court, the Court of Final Appeal. Moreover, the Basic Law authorizes the HKSAR government to "make appropriate arrangements with foreign states for reciprocal juridical assistance" subject to the approval of the central government of the PRC.

*Cheung v. United States,* 213 F.3d 82, 84 (2d Cir.2000)(some citations omitted); *see also* Krause Decl., ¶3, Exh. B at 1525–60 (setting forth the Basic Law).

On October 5, 1992, Congress enacted the United States–Hong Kong Policy Act ("Act"), 22 U.S.C. §§ 5701–5732, *see* Pub.L. No. 102–383, 106 Stat. 1448 (1992), expressing its support for the Joint Declaration and "its wish to see full implementation of the Joint Declaration." 22 U.S.C. § 5701. The Act further expresses the intent of Congress that the United States "should actively seek to establish and expand direct bilateral ties and agreements with Hong Kong in economic, trade, financial, monetary, aviation, shipping, communication, tourism, cultural, sport, and other appropriate areas." 22 U.S.C. § 5711(2). The Act provides "[t]he United States should continue to fulfill its obligations to Hong Kong under international agreements, so long as Hong Kong reciprocates, regardless of whether the People's Republic of China is a party to the particular international agreement...." 22 U.S.C. § 5712(2). Additionally, the Act further provides:

> For all purposes ... the Congress approves the continuation in force on and after July 1, 1997, of all treaties and other international agreements ... entered into before such date between the United States and Hong Kong, or entered into before such date between the United States and the United Kingdom and applied to Hong Kong, unless or until terminated in accordance with law.

22 U.S.C. § 5721(b).

On December 20, 1996, the United States entered into an "Agreement with

Hong Kong for the Surrender of Fugitive Offenders" ("the Agreement").[3] Krause Decl., ¶ 4, Exh C. at 1561–85. On March 3, 1997, President Clinton transmitted the Agreement to the Senate for its advice and consent. *Id.* at 1562. With the transmittal letter, President Clinton included a Letter of Submittal from Secretary of State Madeline Albright, stating:

> Although entitled an "Agreement" to reflect Hong Kong's unique juridical status, for purposes of U.S. law, the instrument will be considered to be a treaty, and therefore I am submitting it to you for transmittal to the Senate for advice and consent to ratification. In that regard, I note that Hong Kong is entering into the Agreement with the authorization of "the sovereign government which is responsible for its foreign affairs." At present, that is the United Kingdom. However, the [People's Republic of China] has also approved the Agreement and authorized its continuation in force after July 1, 1997[,] through approval of the Sino–British Joint Liaison Group.

*Id.* at 1563. On October 23, 1997, the Agreement was ratified by a two-thirds vote of the Senate. 143 Cong. Rec. S11165–02 (Oct. 23, 1997).[4]

---

3. Prior to the Agreement, treaties between the United States and the United Kingdom had governed extradition between the United States and Hong Kong:

> From 1977 to June 30, 1997, extradition relations between the United States and Hong Kong were governed by the Treaty on Extradition between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972, U.S.-U.K., 28 U.S.T. 227, made applicable to Hong Kong by an exchange of diplomatic notes on October 21, 1976, see 28 U.S.T. at 238–41, and the Extradition Supplementary Treaty Concerning the Extradition Treaty

## DISCUSSION

### IV

Extradition is "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender." *Terlinden v. Ames,* 184 U.S. 270, 289, 22 S.Ct. 484, 492, 46 L.Ed. 534 (1902). Section 3184 of Title 18, United States Code, "confers jurisdiction on 'any justice or judge of the United States' or any authorized magistrate to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation." *Cornejo–Barreto v. Seifert,* 218 F.3d 1004, 1009 (9th Cir.2000). Specifically, Section 3184 provides, in pertinent part:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, ... any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign govern-

> Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.A.S. No. 12050 (the "Supplementary Treaty"), made applicable to Hong Kong by its terms. See Supplementary Treaty, art. 6(a) & annex.

*Cheung,* 213 F.3d at 85 (case citations omitted).

4. Under the Treaty Clause, Article II, section 2 of the Constitution, the President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const., Art. II, § 2.

ment any of the crimes provided for by such treaty or convention, ..., issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, ..., he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. § 3184. Thus, as the Ninth Circuit has held:

> The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty. In the absence of a treaty there is no duty to extradite, and no branch of the United States government has any authority to surrender an accused to a foreign government except as provided for by statute or treaty.

*Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.) (citations omitted), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). Further, "[t]he requesting nation must demonstrate that there is probable cause that the fugitive committed the charged offense." *Cornejo–Barreto*, 218 F.3d at 1009; *Quinn*, 783 F.2d at 783.

■ "The extradition process is ordinarily initiated by a formal request from a foreign government to the Department of State, which along with the Department of Justice, evaluates whether the request is within the scope of the relevant extradition treaty between the United States and the requesting nation." *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir.2000); *Cornejo–Barreto*, 218 F.3d at 1009. "Once approved, the United States Attorney for the judicial district where the person sought is located files a complaint in federal district court seeking an arrest warrant for the person sought." *Barapind*, 225 F.3d at 1105; *Cornejo–Barreto*, 218 F.3d at 1009. A hearing is then held before a federal judge to determine whether the offense is extraditable [5] and probable cause exists to sustain the charge(s). *Ibid.* If these requirements are met, the judicial officer must certify the individual as extraditable to the Secretary of State. *Ibid.*

■ "Because a certification of extraditability is not a final order, no direct appeal from the decision will lie and review is available only by way of a petition for habeas corpus." *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). "The scope of habeas review of an extradition order is severely limited." *Artukovic v. Rison*, 784 F.2d 1354, 1355–56 (9th Cir.1986). More specifically, the court may only consider whether the extradition judge had jurisdiction to conduct the proceeding and over the individual sought, whether the extradition treaty was in force and the crime fell within the treaty's terms, whether there is probable cause the individual sought committed the crime, and whether the crime comes within the political offense exception. *Cornejo–Barreto*, 218 F.3d at 1009–

---

**5.** To be extraditable, the crime must be within the scope of the treaty, a crime in both the requesting state and the United States, and a crime not subject to the political offense exception. *Cornejo–Barreto*, 218 F.3d at 1009 n. 4.

10; *In re Extradition of Coe*, 261 F.Supp.2d 1203, 1205–06 (C.D.Cal.2003).

### V

■ "The power to make treaties is given by the Constitution in general terms, without any description of the objects intended to be embraced by it...." *Holmes v. Jennison*, 14 Pet. 540, 39 U.S. 540, 569, 10 L.Ed. 579 (1840). In other words, "the Constitution does not ... define the term 'treaties.'" *Made in the USA Foundation v. United States*, 242 F.3d 1300, 1313 (11th Cir.), *cert. denied*, 534 U.S. 1039, 122 S.Ct. 613, 151 L.Ed.2d 536 (2001); *see also* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free–Form Methods in Constitutional Interpretation*, 108 Harv. L.Rev. 1221, 1265 (1995) ("What the Founders saw as the precise definition of treaties ... is largely lost to us now. Consequently, line-drawing in this area is especially complex." (footnote omitted)).

The petitioner adamantly contends this Court lacked subject matter jurisdiction to certify his extradition to Hong Kong because the Agreement between the United States and Hong Kong is not a proper "treaty" under the Constitution, and to support his contention, petitioner selectively cites various references in the Federalist Papers, treatises and case law. *See* Petition at 7:3–21:2. Based on these "authorities," petitioner claims the United States cannot enter into any treaty with Hong Kong because Hong Kong is not a completely sovereign nation. This Court is not persuaded.

None of the "authorities" petitioner cites explicitly address whether the United States can constitutionally adopt an extradition treaty with a political entity such as Hong Kong.[6] *Cf. Ntakirutimana v. Reno*, 184 F.3d 419, 426 (5th Cir.1999) ("We are unpersuaded by [petitioner's] extended discussion of the Constitution's history. [Petitioner] does not cite to any provision in the Constitution or any aspect of its history that requires a treaty to extradite."), *cert. denied*, 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 929 (2000). Moreover, every federal court to consider the Agreement has determined it is a valid, constitutional extradition treaty between the United States and Hong Kong. *See Cheung*, 213 F.3d at 88–95 (holding the Agreement is a treaty between the United States and a foreign government within the meaning of 18 U.S.C. § 3184, and does not violate the separation of powers principle); *Coe*, 261 F.Supp.2d at 1211 (rejecting constitutional and statutory challenges to the Agreement); *United States v. Sai–Wah*, 270 F.Supp.2d 748, 749–50 (W.D.N.C.2003) (denying a motion to dismiss for lack of subject matter jurisdiction based on the alleged invalidity of the United States's extradition treaty with Hong Kong). Accordingly, this Court determines the Agreement between the United States and Hong Kong is a valid and constitutional extradition treaty.[7]

### VI

■ A magistrate judge may certify extraditability only if she "deems evidence

---

6. Petitioner also cites 25 U.S.C. § 71, pertaining to Indian nations or tribes, as "the only case or legislative act addressing the issue of non-sovereign entities and the Treaty Clause." Petition at 15:20–24. But this is not true. *See, e.g., Cheung*, 213 F.3d at 89–90 (noting that at the time the federal extradition statute was passed, the United States had "ratified hundreds of treaties with Indian tribes or nations").

7. Even if petitioner's interpretation of the Treaty Clause is correct, and the United States can only enter into treaties with other "sovereign nations," it would not necessarily benefit petitioner. Rather, the P.R.C.'s express approval or ratification of the Agreement between Hong Kong and the United States may be sufficient to satisfy the purported "sovereign nation" requirement in the Treaty Clause.

sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir.1984). Article 13 of the extradition treaty between the United States and Hong Kong states, in relevant part:

> A fugitive offender shall be surrendered only if the evidence be found sufficient according to the law of the .requested Party . . . to justify the committal for trial of the person sought if the offence of which he is accused had been committed in the requested Party. . . .

Krause Decl., Exh. C at 1581. "This language requires extradition under the Treaty to be based on competent evidence that would be sufficient to establish probable cause to hold a defendant for trial under United States law." *Emami v. United States District Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1447 (9th Cir.1987). Nevertheless, "the country seeking extradition is not required to produce all its evidence at an extradition hearing and it is not [this Court's] role to determine whether there is sufficient evidence to convict the accused." *Quinn*, 783 F.2d at 815. Rather, probable cause exists "if there is any competent evidence in the record to support it." *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir.1996); *Quinn*, 783 F.2d at 791. Competent evidence includes hearsay evidence, "and the usual rules of evidence are not applicable in this context." *Then*, 92 F.3d at 855 (citations omitted); *Quinn*, 783 F.2d at 815–16.

■ Petitioner contends this Court erred in certifying his extradition on theft charges three to six and ten to seventeen[8]

because there is no probable cause to support these charges. Specifically, petitioner claims probable cause is lacking on these charges because "[t]here is no evidence to suggest that the . . . withdrawals referenced in Charges Three to Six and Charges Ten to Seventeen constituted [PMIL] revenues, as opposed to funds personally lent by [petitioner]." Petition at 23:24–27. Petitioner's contention is without merit.[9]

Under Hong Kong law, "[a] person commits theft if he dishonestly appropriates property belonging to another with the intention of permanently depriving the other of it. . . ." Hong Kong Theft Ordinance § 2; *see also* Krause Decl., ¶ 2, Exh. A at 111–16 (Affidavit, Graham David Goodman). Here, the affidavits of various witnesses show that for each of the disputed charges, petitioner withdrew money from PMIL's bank account in cash or through checks made out to himself or cash and, in most instances, deposited the money in his personal bank account. *See, e.g.*, Krause Decl., ¶ 2, Exh. A at 169–93, 231–63, 297–349 (Affidavit, CHEUNG Lap-ho), 353–63 (Affidavit, LING Wai-hong), 469–78 (Affidavit, CHAN Kit-wah), 437–44 (Affidavit, HUI Mei-fong), 984–1275 (Affidavit, HO Man-ling). None of these withdrawals were authorized by PMIL's shareholders, and there was no record of these transactions as director's drawings or in the director's current account, as they would have been if they were petitioner's salary. Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho), 534–70 (Affidavit, HO Man-kit (Horace)), 657–63

---

8. Charges three to six and ten to seventeen each allege that on a specified date in 1997 or 1998 petitioner stole a specified amount of money owed by a bank to PMIL, and that money was the property of PMIL. Petition, Exh. A.

9. Although petitioner now suggests he "**may** have lent funds to PMIL (emphasis added)," petitioner points to no evidence in the record documenting any loans. In any event, any defense .petitioner might raise at trial "does not affect the probable cause determination." *Barapind v. Enomoto*, 360 F.3d 1061, 1071 (9th Cir.2004).

(Affidavit, LAU Wing–Hung (Johnny)), 722–29 (Affidavit, WONG Sai-wing (James)). Further, on April 17, 1998, petitioner abruptly closed PMIL and fled Hong Kong for the United States. Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho), 437–44 (Affidavit, HUI Mei-fong), 469–78 (Affidavit, CHAN Kit-wah), 506–07 (Affidavit, CHENG To-chung), 722–29 (Affidavit, WONG Sai-wing (James)). Due to the thefts by petitioner, PMIL's debts exceeded its assets by such a magnitude the directors of PMIL decided to liquidate PMIL. Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho), 353–63 (Affidavit, LING Wai-hong), 930–33 (Affidavit, CHAN Wai-dune (Charles)). At the time PMIL was liquidated, petitioner owed PMIL more than HK $7 million. Krause Decl., ¶ 2, Exh. A at 930–33 (Affidavit, CHAN Wai-dune (Charles)).

More specifically, probable cause for charges three through six and ten through seventeen is established by the affidavit of Detective Senior Inspector Cheung Lap-ho, who describes in detail the circumstances surrounding each of petitioner's unauthorized withdrawals of money from PMIL's accounts. Krause Decl., ¶ 2, Exh. A at 169–93 (Affidavit, CHEUNG Lap-ho).[10] Additional support for the probable cause determinations comes from the affidavits of LING Wai-hong, HUI Mei-fong, CHAN Kit-wah, HO Man-ling and HUI Ling-wan, which establish petitioner withdrew the amounts listed in charges three through six and ten through seventeen from PMIL's bank accounts with Shanghai Commercial Bank, Ltd, and deposited most of the funds in his personal bank account. Id. at 353–63 (Affidavit, LING Wai-hong), 437–44 (Affidavit, HUI Mei-fong), 469–78 (Affidavit, CHAN Kit-wah), 984–1275 (Affidavit, HO Man-ling), 1276–1439 (Affidavit, HUI Ling-wan). Furthermore, the affidavits of LAU Wing–Hung (Johnny) and WONG Sai-wing (James) establish that none of petitioner's withdrawals from PMIL's account that are the subject of charges three through six and ten through seventeen was authorized by PMIL's shareholders, and there was no agreement petitioner could withdraw PMIL funds for his personal use or borrow money from PMIL. Id. at 657–63 (Affidavit, LAU Wing–Hung (Johnny)), 722–29 (Affidavit, WONG Sai-wing (James)). Moreover, there is no evidence that any of the transactions in charges three through six and ten through seventeen were director's drawings, see id. at 437–44 (Affidavit, HUI Mei-fong), 469–78 (Affidavit, CHAN Kit-wah), because, if so, they would have been recorded as petitioner's salary. Id. at 534–70 (Affidavit, HO Man-kit (Horace)). This evidence is more than sufficient to establish probable cause to extradite petitioner on the disputed theft charges. Then, 92 F.3d at 855; Oen Yin–Choy, 858 F.2d at 1408.[11] At the time PMIL was liquidated, petitioner owed PMIL over HK $7 million. Id. at 353–63 (Affidavit, LING Wai-hong), 930–33 (Affidavit, CHAN Wai-dune (Charles)).

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law

---

10. Indeed, "an extradition request may be based entirely on an investigator's affidavit summarizing other witnesses' hearsay statements and information." Barapind, 360 F.3d at 1068 (9th Cir.2004); Emami, 834 F.2d at 1451.

11. Further, petitioner does not challenge this Court's probable cause findings on charges one, two, seven, eight, nine, eighteen, nineteen and twenty, and, thus, implicitly concedes there is probable cause to extradite him on those charges.

herein; and (3) entering Judgment denying the petition and dismissing the action with prejudice.

March 22, 2004.