**In the Matter of the EXTRADITION OF Petru MIRONESCU**

No. 103M205–1.

United States District Court, M.D. North Carolina.

Dec. 4, 2003.

Federal Public Defender, Greensboro, NC, for Petru Mironescu (1), defendant.

## MEMORANDUM AND ORDER ON EXTRADITION

DIXON, United States Magistrate Judge.

Before this court is the Criminal Complaint against Petru Mironescu (docket no. 2) and the Romanian Request for Extradition (exhibit nos. 1 and 6). On November 10, 2003, this court conducted a bail hearing. Because the issues presented at the bail hearing were so intertwined with the issues to be presented at the extradition hearing, the bail hearing was continued for one week and merged with an extradition hearing. On November 17, 2003, this court conducted an extradition hearing pursuant to 18 U.S.C. § 3184. Briefs were filed by both parties for both hearings. The matters are ripe for disposition.

## I. Background

These extradition proceedings were commenced by the United States pursuant to 18 U.S.C. § 3184 and the Treaty on Extradition between the United States and Romania, signed July 23, 1924 and entered into force on April 7, 1925. Extradition Treaty, July 23, 1924, U.S.-Rom., 44 Stat. 2020. A copy of this Treaty has been filed with the court (exhibit no. 14). Petru Mironescu was arrested on October 31, 2003, after Romanian authorities presented a formal request for Defendant's extradition, supported by appropriate documentation.

Romania seeks Defendant's extradition, not merely for prosecution of an offense, but rather because he has already been prosecuted and convicted. Defendant has been sentenced to three years imprisonment for entering a partnership for committing auto thefts, three years imprisonment for instigation of aggravated theft, and three years imprisonment for bringing a motor vehicle with false license plates into traffic. *See* Romanian Request for Extradition p. 2 (translated into English) (exhibit no. 6). Defendant's sentences were merged to a 4 year term of Imprisonment. *Id.*

At trial, Defendant did not contest that he was the one whom Romania was seeking to extradite. Rather, he claimed that he had not committed the crimes, and that his prosecution, conviction, and the request for his extradition were part of the Romanian government's retaliation for his leadership of the Roma (or Gypsy) people and the ensuing conflicts with the Romanian establishment. Defendant argued, among other things, that he could not be extradited because of the United Nations Convention Against Torture (Torture Convention)(opened for signature Feb. 4, 1985, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708(1984), *reprinted in* 23 I.L.M. 1027 (1984), *modi-*

*fied in* 24 I.L.M. 535 (1985), http://www1.umn.edu/humanarts/instree/ h2catoc.htm), which became law in the United States on November 20, 1994.

Article 3.1 of the Torture Convention requires that "[n]o State Party shall expel, return, ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* Congress enacted language specifically relating to this provision in the Foreign Affairs Reform and Restructuring Act (FARR Act) of October 21, 1998.[1] The discussion that follows will focus, first, on the extradition hearing and the role of a magistrate judge when faced with the type of evidence presented here; and, second, on the significance of the Torture Convention and the possibility that it will inform subsequent proceedings in this case.

## II. Discussion

It is only because the United States has an extradition treaty with Romania that the United States has authority and duty to extradite: current United States extradition statutes only authorize extradition in compliance with an extradition treaty. Specifically, 18 U.S.C. § 3184 gives judicial officers authority to determine the extraditability of any fugitive "[w]henever there is a treaty or convention for extradition between the United States and any foreign government ...." In addition, 18 U.S.C. 3181(a) provides that authority to surrender persons "who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government." With an extradition treaty in place between the United States and Romania, this court has proceeded with an extradition

hearing, and, at the request of Defendant, a bail hearing. The issue of bail will be discussed first.

*The Granting of Bail in International Extradition Proceedings*

■ Because an international extradition proceeding is not a criminal case, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.* does not apply. Similarly, the criteria governing the allowance and the amount of bail in United States criminal cases, found in 18 U.S.C. § 3142(g), are not applicable. *See Kamrin v. United States,* 725 F.2d 1225, 1227–28 (9th Cir.1984). No other statute addresses the setting of bail in international extradition cases.

■ The case law is settled, and the Defendant concedes, that bail should not be granted in international extradition proceedings except in "special circumstances." *See Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903). In his Memorandum of Law in Support of Bail, Defendant argues that " 'special circumstances' exist in this case" because "the government will not be able to establish sufficient probable cause to justify extradition." Memorandum p. 2 (docket no. 10). This court acknowledges that a district court in the Fifth Circuit has held that a substantial likelihood of success on the merits at the extradition hearing constitutes "special circumstances" sufficient to justify bail pending the extradition hearing. *See In re: Ricardo Gonzalez,* 52 F.Supp.2d 725, 736 (W.D.La.1999). Nevertheless, this court found that the evidence presented at the bail hearing did not sufficiently demonstrate the absence of probable cause, and therefore, merely expedited the extradition hearing in order to address these concerns in a timely manner. Because the extradi-

---

1. Foreign Affairs Reform and Restructuring act of 1998, Pub.L. No. 105–277, § 2242, 112 Stat. 2681, 2681–822 (1988). For a brief discussion of the FARR Act, see Zachary Margu-

lis–Ohnuma, *Saying What the Law Is: Judicial Review of Criminal Aliens' Claims Under the Convention Against Torture,* 33 N.Y.U. J. Int'l L. & Pol. 861, 873–74 (2001).

tion hearing is·complete, and this court will certify this matter to the Secretary of State, the issue of bail in the interim between the commencement of extradition proceedings and certification is moot.

### Limited Scope of Extradition Hearings

 The Fourth Circuit recognizes only a limited scope for extradition hearings. "[T]he purpose of an extradition hearing is to 'Inquire into the presence of probable cause to believe that there has been a violation of one or more criminal laws of the extraditing country, that the alleged conduct, if committed in the United States, would have been a violation of our criminal law, and that the extradited individual is the one sought by the foreign nation for trial on the charge of a violation of its criminal laws.'" *Peroff v. Hylton,* 563 F.2d 1099, 1102 (4th Cir.1977) (citing *Peroff v. Hylton,* 542 F.2d 1247 (4th Cir. 1976)).[2] Nothing in this language provides a magistrate judge with the jurisdiction to consider the human rights conditions of the country requesting extradition.

This limited scope has been further constrained by the "rule of non-inquiry" adopted by the federal courts which, in the context of an extradition hearing, disallows judicial inquiry into the human rights practices or actual motive for extradition of countries with whom the United States has an extradition treaty. *See e.g., Cornejo–Barreto v. Seifert,* 218 F.3d 1004, 1009 n. 5 (9th Cir.2000); *Lopez–Smith v. Hood,* 121 F.3d 1322 (9th Cir.1997); *United States v. Kin–Hong,* 110 F.3d 103 (1st Cir.1997); *Martin v. Warden, Atlanta Pen,* 993 F.2d 824 (11th Cir.1993).[3] This rule has grown from the understanding that the Secretary

of State should be the one to make a final decision about our obligations to other nations in the context of extradition. *See Shapiro v. Ferrandina,* 478 F.2d 894 (2nd Cir.1973) ("Since such a ruling can only be advisory in character, and in certain circumstances might cause embarrassments to the executive branch in the conduct of foreign affairs, arguably it should be left to the Secretary of State to determine whether to seek to impose any limitations since he alone will have the duty of making a response if the requesting state chooses not to follow our limitations."); *Ahmad v. Wigen,* 910 F.2d 1063, 1067 (2nd Cir.1990) ("It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."). Because the final decision to extradite comes from the State Department, pleas for refusal of extradition based on the possibility of torture are properly handled by the Secretary of State, or so goes the argument. *See* Zachary Margulis–Ohnuma, *Saying What the Law Is: Judicial Review of Criminal Aliens' Claims Under the Convention Against Torture,* 33 N.Y.U. J. INT'L L. & POL. 861 (2001).

### The Torture Convention: New Obligations on Federal Courts?

The scope of extradition hearings in the Fourth Circuit and the rule of non-inquiry appear to leave little room for this court to consider Defendant's allegations that his Romanian conviction is bogus and that extradition will result in his death. Nonetheless, Defendant's contention that Article 3 of the Torture Convention places new obligations on Federal Courts is not without merit. In fact, the Ninth Circuit and re-

---

**2.** For an argument that the applicable probable cause standard is not the one used by federal courts in preliminary hearings, see *In re Schweidenback,* 3 F.Supp.2d 113, 115 (D.Mass.1998).

**3.** For a detailed discussion of the rule of non-inquiry prior to the 1994 effectuation of the Torture Convention in the United States, see J. Semmelman, *Federal Courts, the Constitution, and the Rule of Non–Inquiry in International Extradition Proceedings,* 76 CORNELL L. REV. 1198 (1991).

cent scholarship have suggested the same,[4] finding discussions of whether or not the treaty is self-executing (or whether or not it has since been executed)—discussions which have been used to block judicial implementation of the Torture Convention[5]—to be insignificant in the face of an Article 3 claim of torture.

The Ninth Circuit has held that the obligation of the United States not to extradite one who faces torture is binding, and that the Secretary's decision to extradite an individual is, therefore, reviewable through a petition for writ of habeas corpus.

> In *Cornejo–Barreto*, we held that the Secretary of State has a "clear and nondiscretionary" duty pursuant to Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention"), implemented through the Foreign Affairs Reform and Restructuring Act ("FARR Act"), Pub.L. No. 105–277, §§ 2242, 1999 U.S.C.C.A.N. 871, and its implementing regulations to "consider[ ] the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition" when determining whether to surrender a fugitive to a foreign country by means of extradition. 218 F.3d at 1011, 1013 (quoting 22 C.F.R. §§ 95.2). Because the FARR Act imposes a "clear standard" against which to measure the Secretary's actions, we concluded that the Secretary's decisions regarding the extradition of a fugitive who claims that he will be tor-

tured if returned is a final agency action reviewable by the courts pursuant to the Administrative Procedure Act ("APA"). *See id.* at 1013–14. *Barapind v. Reno,* 225 F.3d 1100, 1106 (9th Cir.2000) (citing *Cornejo–Barreto v. Seifert,* 218 F.3d 1004 (2000)). The view that the Secretary's decision to extradite an individual who is raising an Article 3 claim should be reviewable is echoed in the scholarship discussed below.

At least one commentator argues that, despite language to the contrary in the United States Senate's Resolution of Advice and Consent, the Torture Convention is, in fact, self-executing. *See* Kristin B. Rosati, *The United Nations Convention Against Torture: A Self-Executing Treaty that Prevents the Removal of Persons Ineligible for Asylum and Withholding of Removal,* 26 DENV. J. INT'L L. & POL'Y 553, (1998). Rosati concludes that this treaty provides individuals the "substantive right" to raise an Article 3 claim in the United States Courts "even if there is no legislation or regulation implementing Article 3." *Id.* at 576. One need not embrace this scholarship, however, to conclude that the Torture Convention brings the federal judiciary out of the age of "non-inquiry." The claim that an individual has the right to raise an Article 3 claim is distinct from the argument that a decision by the Secretary of State to extradite a individual claiming under Article 3 that he will be tortured upon extradition is a judicially reviewable decision.

Zachary Margulis–Ohnuma demonstrates that Article 3, because it is a man-

---

**4.** The discussion that follows will focus on three articles in the following order: Kristin B. Rosati, *The United Nations Convention Against Torture: A Self–Executing Treaty that Prevents the Removal of Persons Ineligible for Asylum and Withholding of Removal,* 26 DENV. J. INT'L L. & POL'Y 553, (1998); *See* Margulis–Ohnuma, *supra* note 1; William M. Cohen,

*Implementing the U.N. Torture Convention in U.S. Extradition Cases,* 26 DENV. J. INT'L L. & POL'Y 517, 532 (1998).

**5.** For a discussion of cases that have reviewed Torture Convention challenges to agency actions, see Margulis–Ohnuma, *supra* note 1 at 874–78.

datory term of the treaty, has full effect because of the "pre-existing, constitutionally-enshrined authority of a federal court to grant a writ of habeas corpus when a treaty is violated" (citing 28 U.S.C. § 2241 (1994); U.S. CONST. art. I § 9, cl. 2). Margulis–Ohnuma *supra* at 881.

> This is an enticingly simple formulation that does no more than take the statutes at their word: § 2241 permits federal courts to grant a writ of habeas corpus when a prisoner is 'in custody in violation of the ... treaties of the United States' (citing 28 U.S.C. § 2241 (1994)). The Torture Convention, a treaty of the United States, prohibits the return of a person to a country 'where there are substantial grounds for believing that he would be in danger of being subjected to torture' (citation omitted). Finally, it is and has been for 200 years 'emphatically the duty of the province of the courts to say what the law is' (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) and *Henderson v. INS*, 157 F.3d 106, 120 n. 12 (1998)). Thus, when the President, two-thirds of the Senate, and at least one other foreign sovereign all agree to create an individual right for persons in custody, that right should be immediately cognizable under § 2241 (citing *Mali v. Keeper of the Common Jail of Hudson County*, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565, (1887)).

*Id.* With this formulation at the crux of his analysis, Margulis–Ohnuma concludes that a new right has been created, and that federal habeas review by an Article III judge over the Secretary of State's decision must, therefore, be available. *Id.* at 885.

William M. Cohen also argues that the Torture Convention mandates such judicial review. "Article 3 of the Torture Convention requires, as a minimum, judicial review in habeas corpus proceedings of any administrative determination to extradite a fugitive to a country in which it is claimed the fugitive is likely to be tortured." William M. Cohen, *Implementing the U.N. Torture Convention in U S. Extradition Cases*, 26 DENV. J. INT'L L. & POL'Y 517, 532 (1998). He reasons that the Torture Convention does not give the Secretary discretion as to whether or not to extradite an individual into torture; that no statute or treaty has given the Secretary the ability to override the mandatory nature of the torture convention; and that the Administrative Procedure Act (APA) expressly provides that a "person suffering legal wrong because of agency action ... is entitled to judicial review thereof." *Id.* at 532 (citing 5 U.S.C. § 702).

Structuring much of his argument around the *Mathews v. Eldridge* consideration of the private interest at stake, the risk of erroneous deprivation of such interest by the procedures provided, and the governmental interest involved (424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)), Cohen insists:

> On balance, the extraordinarily weighty liberty interest of the fugitive, the need for an evidentiary hearing and judicial review to prevent arbitrary or politically motivated erroneous decision[-]making, and the requirement that the courts not participate in a process which would condone torture, in combination, substantially outweigh whatever interest remains in the Secretary of State under Article 3 to be the sole arbiter of fate in such critical human rights decisions mandated by treaty.

Cohen *supra* at 532. He is clear in his assertions that the Torture Convention can not adequately be ascribed to without judicial review of a decision to extradite in the face of Article 3 allegations of torture.

What is also clear, however, is that the Torture Convention does not obligate magistrate judges, during an initial extradition

hearing, to consider the human rights conditions in the country which is seeking extradition of one of its citizens. In fact, there exists no authority on which a magistrate judge could base such a consideration in light of the limited scope set out for extradition hearings. (*See* discussion *supra* pg. 2). Rather, the order of this court reflects no consideration of the possibility of torture at home and leaves, as it must, that consideration to the Secretary of State and, after the Secretary's decision, any federal habeas review that this Defendant can gain.

## III. Findings

This court finds the following:

1. That there is an extradition treaty in force between the United States and Romania, and that this court has jurisdiction in the matter;

2. That Defendant has been convicted of entering a partnership for committing offenses in violation of article 323, paragraph 2 of the Romanian Penal Code; for instigating aggravated theft in violation of articles 25,208, and 209, of the Romanian Penal Code; and for use of false vehicle license plates in violation of article 35 of decree 328 of 1966;

3. That the crimes with which Defendant is charged are extraditable offenses within the terms of Article 2 of the Treaty;

4. That Defendant, who appeared before this court, is the same person who is charged in Romania in the order of arrest issued by the District Court of Targu Mures, on December 4, 1997; and

5. That the evidence establishes probable cause to believe that Defendant committed the charged offenses.

## IV. Conclusion

For the foregoing reasons, this matter is certified to the Secretary of State in order that a warrant may issue for the surrender of Defendant to the proper authorities of Romania in accordance with the Extradition Treaty between the United States of America and Romania.

It is **ORDERED** that Petru Mironescu be committed to the custody of the United States Marshal, or his authorized representative, to be confined in appropriate facilities and to remain until such surrender shall be made to Romania pursuant to applicable provisions of the Treaty and United States law. No bail shall be set.

It is further **ORDERED** that the United States Attorney for the Middle District of North Carolina shall forward a copy of this Memorandum, Certification, and Order together with a copy of all transcripts of proceedings and copies of documents received into evidence in this matter, to the Secretary of State.

 Last of all, it is noted that Defendant offered into evidence at the extradition hearing the tapes of a hearing before an Immigration Judge of the Immigration and Naturalization Service (INS) wherein Defendant was granted asylum.[6] For the

---

**6.** The granting of asylum does not preclude extradition. Defendant's assertion that the Immigration and Naturalization Act (8 U.S.C. 1158(c)) protects one who has been granted asylum from extradition fails to acknowledge the distinction between the asylum process and the extradition process. The Treaty between the United States and Romania provides specifically that each

shall, upon requisition duly made as herein provided, deliver up to justice *any person who may be charged with, or may have been*

*convicted of, any of the crimes specified in Article II of the present Treaty committed within the jurisdiction of one of the High Contracting Parties, and who shall seek an asylum or shall be found within the territories of the other . . .* (emphasis added).

Extradition Treaty, July 23, 1924, U.S.-Rom., art. I, 44 Stat.2020. Were there not probable cause to believe that Defendant committed the crime with which he has been convicted in Romania, then his asylum would preclude his deportation. The extradition treaty controls, however, when the subject is extradition

reasons explained above, it is **ORDERED** that the tapes are not admissible at this stage of the process. While they may weigh on an examination of Defendant's Article 3 claims of torture, they have no bearing on whether his extradition can be certified to the Secretary of State.

rather than deportation. The extradition treaty requires Defendant's extradition in this case (unless, of course, the Secretary of State or a federal judge on habeas corpus review finds that the Torture Convention discussed above compels the United States to refuse extradition). *See* text *supra* p. 7.