**Petru MIRONESCU, Petitioner,**

v.

**Harlon E. COSTNER, United States Marshal for the Middle District of North Carolina, and William Schatzman, Sheriff of Forsyth County, Respondents.**

**No. 1:04 CV 0022.**

United States District Court, M.D. North Carolina.

Nov. 9, 2004.

Greg Davis, Office of Federal Public Defender, Greensboro, NC, for Plaintiff.

Robert M. Hamilton, Office of U.S. Attorney, Greensboro, NC, for Defendants.

### ORDER

BEATY, District Judge.

On April 12, 2004, in accordance with 28 U.S.C. § 636(b), the Recommendation of the United States Magistrate Judge was filed and notice was served on the parties in this action and a copy was given to the Court.

Within the time limitation set forth in the statute, Petitioner objected to the Recommendation.

The Court has appropriately reviewed the portions of the Magistrate Judge's report to which objection was made and has made a *de novo* determination which is not fully in accord with the Magistrate Judge's report. The Court hereby adopts in part and denies in part the Magistrate Judge's Recommendation.

The Court adopts the Magistrate Judge's finding that Petitioner's certification for extradition is valid and the extradition treaty between the United States and Romania does apply. Furthermore, the Court agrees that within the narrow habeas review allowed by the Fourth Circuit of extradition certification, no review is presently allowed to consider Petitioner's evidence of a violation of Article 3 of the United Nations Convention Against Torture.[1] *Rec. of. U.S. Magistrate Judge Dixon* at 8, citing to *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir.1984). *See also Sandhu v. Burke*, No. 97 Civ. 4608(JGK), 2000 WL 191707, at *10 (S.D.N.Y. Feb.10, 2000)("[T]he Court of Appeals, through reaffirmation of the rule of non-inquiry, has made unmistakably clear that this [c]ourt may not consider evidence such as that urged upon the [c]ourt by the petitioners. It is to the Secretary of State that the petitioners must address their humanitarian arguments sounding in international law.")

■ Furthermore, the Court disagrees with and hereby rejects the Magistrate Judge's Recommendation, in so far as it goes beyond the question presently before this Court, which is whether to accept the Magistrate Judge's certification of extradition. Magistrate Judge Dixon ruled that Petitioner would be able to re-file his habeas petition, after the Secretary of State makes a determination as to whether to extradite Petitioner, on the question of whether the Secretary's determination violates Article 3 of the Convention Against Torture. In making that recommendation, Magistrate Judge Dixon relied primarily on *Cornejo–Barreto v. Seifert*, 218 F.3d 1004 (9th Cir.2000), which was overturned by a panel of the Ninth Circuit on August 16, 2004. *Cornejo–Barreto v. Siefert*, 379 F.3d 1075, 1088 (9th Cir.2004)(holding that no habeas review after the Secretary's determination was allowable under the Rule of Non–Inquiry). However, the second *Cornejo–Barreto* case has now itself been vacated, as the Ninth Circuit has decided to take up the matter *en banc*. *Cornejo–Barreto v. Seifert*, No. 02–56605, 2004 WL 2377460 (9th Cir. Oct.19, 2004).

Additionally, Magistrate Judge Dixon also relied heavily on the case of *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), for two other theories,

---

1. United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, adopted by unanimous agreement of the U.N. General Assembly, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51 at 197, U.N. Doc. A/RES/39/708 (1984), entered into force as to the United States Nov. 20, 1994, signed April 18, 1988.

constitutional avoidance and strict constructionalism, to help decide the question of whether the Secretary's determination would be reviewable by this Court as to Petitioner's claim under the Convention Against Torture. However, there is no authority that this Court could find that allows *St. Cyr* to be applied in the context of extradition, as opposed to deportation. Because of (1), the uncertainty raised by the recent vacating of the second *Cornejo–Barreto* case, and (2) the fact that there is no court authority applying *St. Cyr* to extradition, and (3), the fact that there will be no final order in this case until after the Secretary's determination, this Court feels it is not currently appropriate to address the issue of whether Petitioner may appropriately seek habeas review of the Secretary's determination. *See Karsten v. Kaiser Found. Health Plan*, 36 F.3d 8, 11 (4th Cir.1994)(finding that courts should refrain from "solving questions that do not actually require answering in order to resolve the matters before them"). To that end, the Court rejects that portion of Magistrate Judge Dixon's opinion that relies upon dicta from the first *Cornejo–Barreto*. 218 F.3d 1004 (9th Cir.2000).

Petitioner will be able to bring his humanitarian concerns to the attention of the Secretary of State, who is charged with appropriately applying the Convention Against Torture, but this Court declines at this time to decide whether Petitioner can appropriately seek habeas review after the Secretary's determination.

However, this Court will explicitly hold, as Magistrate Judge Dixon's opinion did not, that the Secretary of State must notify Petitioner of the issuance of the surrender warrant in order to give Petitioner adequate time to decide whether to seek additional habeas relief.

In conclusion, for the reasons stated herein, the Court adopts the Magistrate Judge's Recommendation to the extent that it certifies that Petitioner is extraditable. The Court, however, rejects as dicta the Magistrate Judges's Recommendation, to the extent that it finds habeas review is available after the Secretary of State determines whether to extradite Petitioner, and in turn declines to decide the issue as not ripe. Therefore, it is hereby ordered that Petitioner's petition for writ of habeas corpus [Document # 1] is DENIED without prejudice.

The Court notes that Petitioner filed a motion [Document # 14] on October 15, 2004, requesting a hearing before this Court in order to determine the status of the Court's review of the Magistrate Judge's Recommendation. Given that the Court has now considered the Magistrate Judge's Recommendation and made a *de novo* determination, Petitioner's motion for a hearing is deemed moot and is therefore DENIED.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

Before this court is Petitioner's petition for writ of habeas corpus (docket no. 1). Petitioner asks for review of this court's certification to the Secretary of State that Petitioner was extraditable to Romania. The United States has responded (docket no. 2). This matter is ripe for disposition. For the reasons discussed here, Petitioner's petition should be denied.

### I. Background

The following background information is laid out in *In the Matter of the Extradition of Petru Mironescu*, 296 F.Supp.2d 632 (M.D.N.C.2003).

These extradition proceedings were commenced by the United States pursuant to 18 U.S.C. § 3184 and the Treaty on Extradition between the United States and Romania, signed July 23, 1924 and entered into force on April 7, 1925. Extradition Treaty, July 23, 1924, U.S.-Rom., 44 Stat.2020. A copy of this Treaty has been filed with the court (exhibit no. 14). Petru Mironescu was arrested on October 31, 2003, after Romanian authorities presented a formal request for Defendant's extradition, supported by appropriate documentation.

Romania seeks Defendant's extradition, not merely for prosecution of an offense, but rather because he has already been prosecuted and convicted. Defendant has been sentenced to three years imprisonment for entering a partnership for committing auto thefts, three years imprisonment for instigation of aggravated theft, and three years imprisonment for bringing a motor vehicle with false license plates into traffic. *See* Romanian Request for Extradition p. 2 (translated into English) (exhibit no. 6). Defendant's sentences were merged to a 4 year term of imprisonment. *Id.*

At trial, Defendant did not contest that he was the one whom Romania was seeking to extradite. Rather, he claimed that he had not committed the crimes, and that his prosecution, conviction, and the request for his extradition were part of the Romanian government's retaliation for his leadership of the Roma (or Gypsy) people and the ensuing conflicts with the Romanian establishment. Defendant argued, among other things, that he could not be extradited because of the United Nations Convention Against Torture (Torture Convention)(opened for signature Feb. 4, 1985, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708(1984), *reprinted in* 23 I.L.M. 1027 (1984), *modified in* 24 I.L.M. 535 (1985), http://www1.umn.edu/humanarts/instree/h2catoc.htm), which became law in the United States on November 20, 1994.

Article 3.1 of the Torture Convention requires that "[n]o State Party shall expel, return, ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* Congress enacted language specifically relating to this provision in the Foreign Affairs Reform and Restructuring Act (FARR Act) of October 21, 1998.[1]

*Id.* at 633–34.

This court certified Petitioner for extradition in an order that focused, first, on the extradition hearing and the role of a magistrate judge when faced with the type of evidence presented, and, second, on the significance of Article 3 of the United Nations Convention Against Torture (Torture Convention) and the possibility that it would inform subsequent proceedings in this case. Petitioner has filed this petition for writ of habeas corpus complaining that the order certifying extradition is illegal because it is based on a treaty that does not apply to petitioner (Petition, p. 4 (docket no. 1)), and because it violates both Article 3 of the Torture Convention and 8 U.S.C. § 1158(c) (Petition, p. 9 (docket no. 1)). The United States has responded arguing that Petitioner is, in fact, extraditable under the extradition treaty with Ro-

---

1. Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, § 2242, 112 Stat. 2681, (1988). For a brief discussion of the FARR Act, see Zachary Margulis-Ohnuma, *Saying What the Law Is: Judicial Review of Criminal Aliens' Claims Under the Convention Against Torture*, 33 N.Y.U. J. INT'L L. & POL. 861, 873–74 (2001).

mania (Response, p. 5 (docket no. 2)); that 8 U.S.C. § 1158 does not bar Petitioner's extradition to Romania (Response, p. 6 (docket no. 2)); and that Petitioner has no private claim under the Torture Convention (Response, p. 8 (docket no. 2)).

There is debate about when and to what extent Article 3 of the Torture Convention became applicable and enforceable law in the United States. In 1988, the United States signed the Torture Convention. In 1994, the United States became a full party to the Torture Convention, subject to certain reservations, understandings, and declarations. *See, e.g.,* Abra Edwards, *Cornejo–Barretto Revisited: The Availability of a Writ of Habeas Corpus to Provide Relief from Extradition Under the Torture Convention,* 43 VA. J. INT'L L. 889, 891 (2003); Kristin B. Rosatti, *The United Nations Convention Against Torture: A Self–Executing Treaty that Prevents the Removal of Persons Ineligible for Asylum and Withholding of Removal,* 26 DENV. J. INT'L L. & POL'Y 533, 536 (1998). Yet, implementing legislation for Article 3 was not signed into law until October 21, 1998. *See, e.g.,* Elizabieta Klimowicz, *Article 15 of the Torture Convention: Enforcement in U.S. Extradition Proceedings,* 15 GEO. IMMIGR. L.J. 183, 188 (2000).

This implementing legislation charged "the heads of appropriate agencies" with implementing the requirements of Article 3.

Not later than 120 days after the date of enactment of this Act, the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution or ratification of the Convention.

Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, § 2242(b), 112 Stat. 2681 (1999) [hereinafter FARR Act]. Specifically, the Attorney General was assigned the task of expelling and returning aliens from the United States in a manner that complied with Article 3, *see* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8,478 (Feb. 19, 1999), and the Department of State was assigned the task of implementing the obligations of the United States under the Article 3, *see id.*

According to the text of Article 3 and the implementing regulations, it seems clear that the Department of State (specifically the Secretary of State) and the Attorney General must ensure that one who is likely to face torture upon return is neither returned nor extradited. *See* Klimowicz, *supra,* at 187–88. The issue that is not clear, and on which much of this opinion is focused, is when and to what extent the courts may become involved in decisions that require analysis of the probability that one will be tortured upon, in the case at hand, extradition. The posture of this case dictates that the discussion begin with an analysis of whether habeas review before the Secretary of State makes a decision is appropriate.

## II. Discussion

*Habeas Review at this stage of the proceedings*

█ Whether habeas review is appropriate at all during this stage of the proceedings is a significant question. At the outset, this court notes that its order certifying extradition is *not* a final order. In its certification that Petitioner was extraditable, this court clearly anticipated federal habeas review following the Secretary of

State's decision: "[T]he order of this court reflects no consideration of the possibility of torture at home and leaves, as it must, that consideration to the Secretary of State and, after the secretary's decision, any federal habeas review that this Defendant can gain." *Mironescu*, 296 F.Supp.2d at 638. This court remains of the opinion that evidence of torture, while significant to upholding our commitments under the Torture Convention, is generally admissible in proceedings of the federal judiciary only after the Secretary of State has mandated an extradition that appears to violate the same. Nevertheless, this court has carefully considered the habeas petition put forth here. Direct appeal is clearly unavailable in extradition cases. *See Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616 (1920).

The Fourth Circuit has specifically addressed the issue of the scope of review of an extradition certification where, as in the case at hand, probable cause has been found. In so doing, the Fourth Circuit indicated that its standard is "an exceedingly narrow one," and adopted the following language:

It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, *by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable* ground to believe the accused guilty. *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir.1984) (alteration in original)(quoting *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)); *see also Antunes v. Vance*, 640 F.2d 3 (4th Cir.1981) (upholding a denial of habeas corpus based on the limited scope of both an extradition hearing and its review). From this passage it is apparent that, although "exceedingly narrow" in scope, some habeas review is available at this stage.

■ The inquiries that the Fourth Circuit finds acceptable are easily disposed of in the case at hand, and none have been directly asserted in the habeas petition. The presiding magistrate judge clearly had jurisdiction,[2] the plain language of the

**2.** In *Plaster v. United States*, 720 F.2d 340, 346 (4th Cir.1983), the court explained that 18 U.S.C. § 3186 grants the Secretary of State the power to extradite a person only after that person has been certified by a federal judge or magistrate to be extraditable under § 3184. That section provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for

the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made. 18 U.S.C. § 3184.

treaty includes the offense charged,[3] and there was certainly evidence to support a probable cause finding as Petitioner had actually been convicted of the crime charged as detailed in extensive documents passed through the American Consulate in Romania. *See Mironescu*, 296 F.Supp.2d at 632, 638.[4] Within this "exceedingly narrow" habeas review, the Fourth Circuit allows no review of a magistrate's extradition order in light of an Article 3 claim of torture by a petitioner.

*Application of the Extradition Treaty to Petitioner*

█ Petitioner renews his claims that the extradition treaty, although valid and in existence, never applied to Petitioner because of the language of the statute, and because of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1158(c). These claims may be barred by the understanding that habeas review is "not a means for rehearing what the magistrate has already decided," *Prushinowski*, 734 F.2d at 1018, as the existence of an applicable treaty was found in the certification of extraditability, *Mironescu*, 296 F.Supp.2d at 638. Nevertheless, this court will entertain the discussion for the purposes of providing a complete record. This court finds that the extradition treaty does apply and that the INA does not.

The language of the extradition treaty between Romania and the United States clearly brings Petitioner within its scope. The central thesis of Petitioner's argument to the contrary is that the treaty does not apply "because he was not seeking asylum at the time the extradition request of Romania was made. He had already been granted asylum and the matters forming the basis for the extradition request of Romania had already been considered." (Petition, p. 5 (docket no. 1).) He argues that "[t]he language of the treaty applies to cases where a person is in the process of seeking asylum when the extradition request is made." *Id.* at 6. This assertion is entirely incorrect.

The language in question, found in Article I of the Extradition Treaty with Romania, states:

> It is agreed that the Government of the United States and the Government of Romania shall, upon requisition duly made as herein provided, deliver up to justice any person, who may be charged with, or may have been convicted of, any of the crimes specified in Article II of the present Treaty committed within the jurisdiction of one of the High Contracting Parties, and who shall seek an asylum or shall be found within the territories of the other; provided that such surrender shall take place only upon such evidence of criminality, as accord-

---

3. In the certification of extraditability, this court specifically found that "[t]he crimes with which Defendant is charged are extraditable offenses within the terms of Article 2 of the Treaty". *Mironescu*, 296 F.Supp.2d at 638.

4. In both his opposition to the Government's extradition complaint and in this habeas petition, Petitioner contends that he is not extraditable because he was granted asylum by an Immigration and Naturalization Judge. Petitioner's statement that an asylum was granted because "the government was unable to pres-

ent sufficient evidence to substantiate the charges" is irrelevant at best. (Petition, p. 7 (docket no. 1)). The asylum judge himself asserted that his opinion did not take into account or impact possible extradition proceedings. Greg Davis, the Federal Public Defender, arranged for the tapes of Mironescu's asylum hearing to be tendered to my chambers as evidence. Out of an abundance of caution, I examined the tapes and did not formally admit them as evidence. No other published opinion or findings from the asylum judge have been submitted.

ing to the laws of the place where the fugitive or person so charged shall be found, would justify commitment for trial if the crime or offense had been there committed.

Extradition Treaty with Romania, July 23, 1924, U.S.-Rom., 44 Stat.2020 (Govt.Ex. 14).

This court disagrees with Petitioner's assertion that the use of the word "shall" somehow indicates that only those who seek, but have not yet been granted, an asylum are subject to extradition. Nevertheless, the interpretation of the significance of this word does not matter because the text does not merely require extradition for those who shall seek an asylum, but also for those who "shall be found within the territories of" the other country. *Id.* Petitioner was found in this country, and, hence, the treaty is applicable to him (to the extent, of course, that the treaty as a whole is upheld as valid and the crime committed falls within the language of the treaty).

 On the other hand, the language of the INA does not, as Petitioner claims, bring Petitioner within the scope of its protection against deportation. The statute in question provides:

(1) In the case of an alien granted asylum under subsection (b), the Attorney General -

(A) shall not remove or return the alien to the country of nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence.

8 U.S.C. § 1158. Applying this statute to prevent the extradition of Petitioner requires the understanding that an alien, once granted an asylum, can never be extradited—even if the crimes that he committed are not political in nature. This understanding is supported neither by case law nor by the practices of the United States. The statute clearly prevents the Attorney General from removing or returning an alien who has been granted an asylum: once granted an asylum, an alien is protected rather than sent back. This statute says nothing about extradition, which is based on criminal proceedings and governed by an entirely different set of rules and practice. It is entirely inapplicable. Individuals who have been granted an asylum are still eligible for extradition for non-political crimes,[5] just as even United States citizens may be extradited for crimes committed in other countries with whom we have extradition treaties.

*Habeas Review following the Secretary of State's Decision—regardless of whether or not the Torture Convention is self-executing*

Finally, both parties have expended significant energy addressing the issue of whether or not the Torture Convention is self-executing, granting a claim of right to individual litigants. In its certification of extradition, this court highlighted the argument that "discussions of whether or not the treaty is self-executing (or whether or not it has since been executed)—discussions that have been used to block judicial implementation of the Torture Convention" are "insignificant in the face of an Article 3 claim of torture." *Mironescu,* 296 F.Supp.2d at 636. This discussion appears to remain pointless at this stage as demonstrated by any of three alternate approaches to understanding habeas review for aliens who are being forced to

---

5. For one discussion of this matter, see Michelle N. Lewis, *The Political Offense Exception: Reconciling the Tension Between human Rights and International Public Order,* 63. GEO WASH. L. REV. 585, 586–87 (1995) ("[A]n individual who has been granted political asylum in the United States may subsequently be subject to extradition.").

leave the country: administrative procedure, constitutional avoidance, or strict constructionism.

Driving the following discussion is the understanding, already articulated, that the Fourth Circuit allows no review of a magistrate's extradition order in light of an Article 3 claim of torture by a petitioner. Therefore, this opinion could end here without any further exploration. Nevertheless, in order to articulate clearly this court's understanding of the course this case will take after it leaves these chambers, and in order to demonstrate the availability of habeas relief *after* the Secretary of State makes a decision about Petitioner's extradition—regardless of whether or not the Torture Convention is self-executing—this court presses on.

The Ninth Circuit has demonstrated that the Secretary of State's mandate to extradite one who raises an Article 3 claim of torture is reviewable in habeas corpus whether or not an individual litigant has a claim of right under the Treaty. This demonstration, in dicta, focused on administrative procedure and explained that judicial habeas review of a final order was available under the Administrative Procedure Act (5 U.S.C.A. § 704). *Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1007 (9th Cir.2000). A magistrate's certification of extradition is not a final order and therefore no habeas review that reaches an Article 3 claim of torture is available until after the Secretary of State's decision. *See id.* at 1016. When applied to the case

at hand, this approach both disallows habeas review of Petitioner's claims of torture at this stage, and allows the same after a final order is issued, whether or not the Treaty is self-executing.

The Supreme Court, in addressing a slightly different issue, has presented alternate reasoning to support this same conclusion. The pertinent discussion in its complex opinion examines the effect of the 1996 amendments to the INA on the availability of habeas corpus review of deportation orders for certain criminal aliens. *Immigration And Naturalization Service v. St. Cyr*, 533 U.S. 289, 292, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).[6] The Court's analysis presents two rather distinct approaches with little guidance for their application: constitutional avoidance and strict constructionism. Hence one encounters the second and third approaches to understanding habeas review for aliens who are being forced to leave the country.

The doctrine of constitutional avoidance guides the Court in construing statutes so as to avoid constitutional problems. The majority in *St. Cyr* expresses concern about its reading of the Suspension Clause.[7] The Suspension Clause in Article I, Section 9, of the Constitution states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Justice Stevens, writing for the majority, found that the Suspension Clause guarantees some minimum level of habeas re-

---

**6.** Significantly, the Court points out that the petitioner does not "contend that he would have any right to have an unfavorable exercise of the Attorney General's discretion reviewed in a judicial forum." *Id.* at 298. Yet, in the case at hand, Petitioner must contend a right to have an unfavorable exercise of the Secretary of State's discretion reviewed in a judicial forum. Nonetheless, this distinction neither drives the Court's analysis of the

availability of habeas review nor impacts its applicability to the case at hand.

**7.** For a detailed analysis of *St. Cyr* and its protection of federal habeas review, see Abra Edwards, *Cornejo–Barretto Revisited: The Availability of a Writ of Habeas Corpus to Provide Relief from Extradition Under the Torture Convention*, 43 VA. J. INT'L L. 889 (2003).

548

view, especially when judicial review is otherwise unavailable. *St. Cyr*, 533 U.S. at 300, 121 S.Ct. 2271 ("Because of that Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.'"); *see also id.* at 301, 121 S.Ct. 2271 ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."). For this reason the Court requires "sufficient clarity" of any statute attempting to "bar jurisdiction pursuant to the general habeas statute." *Id.* at 313, 121 S.Ct. 2271. Clearly, deportation and extradition are different procedures, yet nothing about the opinion in *St. Cyr* or the circumstances of extradition suggests that this analysis would not apply in the extradition context. *See* Edwards, *supra,* at 900 ("[T]here is no reason to believe that the analysis utilized by the Court in *St. Cyr* would not apply to a similar claim in the extradition context.").

The Court's flirtation with (but not express statement of) strict constructionism comes in its treatment of four provisions, one in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and three in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), in the course of a search for "sufficient clarity". These provisions were offered in *St. Cyr* by the INS in support of its claim that no habeas review should be granted. The first of those provisions is AEDPA's § 401(e), significantly entitled "Elimination of Custody Review by Habeas Corpus". The other three provisions are all found in IIRIRA, now codified at 8 U.S.C. §§ 1252(a)(1), 1252(a)(2)(C), and 1252(b)(9).

The Court explains the pertinent parts of these three IIRIRA provisions:

As amended by § 306 of IIRIRA, 8 U.S.C. § 1252(a)(1) (1994 ed., Supp. V) now provides that with certain exceptions, including those set out in subsection (b) of the same statutory provision, "[j]udicial review of a final order of removal ... is governed only by" the Hobbs Act's procedures for review of agency orders in the courts of appeals. Similarly, § 1252(b)(9), which addresses the "[c]onsolidation of questions for judicial review," provides that "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." Finally, § 1252(a)(2)(C), which concerns "[m]atters not subject to judicial review" states: "Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed certain enumerated criminal offenses."

*St. Cyr,* 533 U.S. at 311, 121 S.Ct. 2271. Perhaps surprisingly, the Court found that none of this language was clear enough to inhibit federal habeas review. *See id.* at 313, 121 S.Ct. 2271. The specifics of the distinctions between "judicial review" and "habeas review" are not as significant as the finding of insufficient clarity, for the applicable extradition statutes are even less clear.

The FARR Act implemented the Article 3 protections of the Torture Convention. Whether it granted to the federal courts jurisdiction to review executive decisions under the Convention is not clear. The Ninth Circuit, in *Cornejo–Barreto*, 218 F.3d at 1015, found that the FARR Act creates a legal obligation which demands

that such jurisdiction be granted to the federal courts. The matter has not been settled among the courts. Nevertheless, this debate becomes insignificant in light of Justice Stevens' concern for the protection of habeas corpus relief in *St. Cyr.*

The applicable provision in the FARR Act, § 2242(d) is entitled "Review and Construction." This implementing provision reads:

Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the application of the policy set forth in subsection (a).

FARR Act, Pub.L. No. 105–277, § 2242(d), 112 Stat. 2681 (1999). When read according to the majority opinion in *St. Cyr*, this specific language, as well as the absence of any specific mention of habeas corpus, supports either a strict constructionist or a constitutional avoidance approach to protecting habeas review of the Secretary of State's decision.

In light of the strict constructionism found in *St. Cyr*, this court notes that in the FARR Act, as in AEDPA and IIRIA, Congress has barred only a court's "jurisdiction to review." *Id.* In *St. Cyr*, the majority interpreted that phrase to bar only direct and not habeas review. 533 U.S. at 310–11, 121 S.Ct. 2271; *see also* Edwards, *supra,* at 903. The Court's reading in *St. Cyr* strengthens the Ninth Circuit's reasoning that habeas review of a final extradition order was not barred by language of the FARR Act.

Likewise, in light of the Supreme Court's concern for avoiding a statutory interpretation that would violate the Suspension Clause of the Constitution, this court notes that the FARR Act contains no mention of habeas review at all. Because habeas review is protected by an independent provision of the Constitution, there is a strong argument that the FARR Act was not intended to curb the availability of habeas review at all. Rather, it is structured to prevent only judicial review of the administrative regulations that the Secretary of State is required to promulgate under the act, and to shore up Congress' insistence that no private right of action be created.

These three approaches, which focus on administrative procedure, constitutional avoidance, and strict constructionism, are distinct. The Court in *St. Cyr* appears to have relied on the latter two, but not the first: a court need not rely on all three. Nevertheless, all three approaches provide a basis for this court's assertion, in its certification of extraditability, of the availability of habeas review that delves into a petitioner's Article 3 claim of torture only after a Secretary of State's decision to extradite. No further petition for habeas relief should take place until after the Secretary of State issues a decision about Petitioner's extradition.

Exactly what habeas review after the Secretary of State's decision will entail remains unsettled. The Court in *St. Cyr* uses the language of "pure questions of law." 533 U.S. at 305, 121 S.Ct. 2271. At least one scholar suggests that "[after St. Cyr] [e]verything may turn on what is considered the really discretionary part of the decision. Discretion will be a dustbin of jurisprudential category: the place where … complicated legal questions go to die." Daniel Kanstroom, *St. Cyr or Insincere,* 16 GEO. IMMIGR. L.J. 413, 443 (2002). He further suggests that this decision will revitalize the distinction,

drawn by the Court in *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), between an impermissible evaluation of an exercise of discretion, and a permissible examination of whether discretion has been exercised at all. Kanstroom, *supra,* at 441 n. 129.

On the other hand, the Ninth Circuit has asserted that the Secretary of State has no discretion in extraditing a petitioner likely to be tortured in their country of origin. *Cornejo–Barreto,* 218 F.3d at 1013–14 ("In the extradition context, this means that the Secretary of State may not surrender any fugitive who is likely to face torture upon return."). While the Secretary of State always has discretion not to extradite an individual who has been certified for extradition by a magistrate judge, the Torture Convention removes any discretion to extradite one who has a valid Article 3 claim of torture. If this understanding prevails, then habeas review would entail detailed examination of the available information about torture in the country to which a petitioner will be extradited.

The scope of habeas review is uncertain. Nevertheless, the probability that habeas review will be granted appears to be high as three separate examinations of the issue all result in the granting of such review. This court remains convinced that Petitioner's Article 3 claims of torture are significant in light of our international obligations under the Torture Convention, but remains equally convinced that this court, at this time, may not examine such claims.

## III. Conclusion

Habeas review is available in the case at hand after, and only after, the Secretary of State mandates an extradition that appears to violate the Torture Convention. For the reasons discussed above, this court RECOMMENDS that Petitioner's petition for writ of habeas corpus be denied without prejudice.